IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHARLENE JACOBSON           :
                            :
v.                          :
                            :   Civil No. WMN-05-1381
JO ANNE B. BARNHART,        :
    COMMISSIONER OF SOCIAL  :
    SECURITY                :


<u>**MEMORANDUM**</u>

Before the Court are cross motions for summary judgment.
Paper Nos. 32 (Plaintiff's) and 33 (Defendant's).  The motions
are fully briefed.  Upon a review of the pleadings and the
applicable case law, the Court finds that no hearing is necessary
(Local Rule 105.6) and that both motions will be granted in part
and denied in part.

## I. FACTUAL BACKGROUND

As to the principal events that gave rise to this action,
there is general agreement.  Plaintiff Charlene Jacobson has been
diagnosed with a number of different medical conditions
including: reactive arthritis, fibromyalgia, asthma, high blood
pressure, ocular myastenia gravis, demyelination of the
peripheral nervous systems, and demyelination of the central
nervous systems.  As a result of these conditions, she is limited
in her ability to walk and suffers periods of incapacitating
fatigue.  These conditions also render it more difficult and time
consuming for Plaintiff to get ready for work in the morning.  In
addition to these baseline limitations, her medical conditions

"flare-up" every four to six months requiring that she be
hospitalized for a week or so to receive intravenous
immunoglobulin (IVIG) treatments.  These hospitalizations are
followed by several week recovery periods in which Plaintiff's
ability to work is initially severely limited, but gradually
increases.

Until September 2003, Plaintiff was employed by the Social
Security Administration (SSA) as an Information Technology
Specialist.  There is no indication in the record that her job
performance was considered to be less than satisfactory and her
first line supervisor, Marian Falkenstine, stated that Plaintiff
was a "valuable employee" with considerable knowledge in the
specialized area in which she worked.  Falkenstine Aff. 10.  Her
employer provided several accommodations for Plaintiff's physical
limitations including the provision of a motorized scooter and a
parking space near her building.  SSA also allowed Plaintiff to
take administrative leave during inclement weather, to take
advanced sick leave, and to bank leave time by working after the
end of her work day and on weekends to cover occasions when she
was unable to arrive at work on time.[1]

In May 2003, Plaintiff experienced one of her flare-ups
requiring hospitalization.  Plaintiff requested an accommodation
in the form of being permitted to work at home for 3 to 5 hours
per day for the third and fourth week post-hospitalization, and

---

[1] Under SSA's flextime plan, employees must begin their
daily shift on or before 9:30 a.m.

to work at home for eight hours a day for as many as four additional weeks.  May 15, 2003 Memo from Plaintiff to Falkenstine.  Plaintiff was provided approximately 3 hours per day of work for the third and fourth week post-hospitalization that could be accomplished at home.  When SSA proved unable or unwilling to provide the requested eight hours per day of at-home work for the following weeks, Plaintiff returned to work full time at the office six weeks after release from the hospital. Among the reasons given for the inability to provide Plaintiff with work to be done at home was Plaintiff's lack of access to the secure Virtual Personal Network (VPN).  Plaintiff had requested that access prior to entering the hospital but, for reasons that still are not clear, that access was never approved.

In July 2003, Plaintiff requested open-ended VPN access that would allow her to work at home three days a week, while working in the office two days a week.  She also requested that, on mornings she was unable to arrive to work by 9:30, she be permitted to make up the time at the end of her shift. Plaintiff's second line supervisor, Ryland Davis, denied both requests.  He denied open-ended VPN access on the ground that SSA's work at home by exception policy does not allow such open-ended access.  He denied the request to work past six o'clock on the ground that, were she to do so, SSA would be required to pay her a night differential.  July 16, 2003, email from Davis to Plaintiff.

In August 2003, Plaintiff suffered another flare-up that led

3

to a hospitalization.  Plaintiff opines that being forced to
return to the office too quickly after her May hospitalization
contributed to this August flare-up.  Because she did not believe
that she would be able to work enough hours to meet her financial
obligations without the accommodation of being able to work three
days a week from home, Plaintiff applied for, and was granted, an
early-out retirement effective September 1, 2003.

Plaintiff filed this Complaint on May 19, 2005, bringing
claims for violations of the Rehabilitation Act of 1973 (Count I)
and the Age Discrimination in Employment Act (Count II), as well
as a claim of constructive discharge (Count III).  Plaintiff
asserts Defendant violated the Rehabilitation Act by refusing to
provide her the opportunity to work sufficient hours at home
following her May 2003 hospitalization, and for refusing her July
2003 requests to be allowed to work at home three days a week and
to be permitted to make up hours by working past 6:00 in the
evening.  In her constructive discharge claim, Plaintiff asserts
that Defendant's refusal to grant the requested accommodations
forced her to retire because the limited hours and compensation
that would be available without those accommodations would be
insufficient to meet her financial obligations.  In her motion
for summary judgment, Plaintiff states she is abandoning her age
discrimination claim.

Discovery has been completed and Plaintiff now moves for
partial summary judgment on her disability claim.  She
acknowledges that her constructive discharge claim and the amount

of damages must be decided at trial.   Defendant has moved for summary judgment as to all claims.

## II. LEGAL STANDARD

A moving party is entitled to summary judgment only upon showing that there exists no genuine issue as to any material fact, and it is entitled to judgment as a matter of law.   <u>See</u> Fed. R. Civ. P. 56(c); <u>Blue Ridge Ins. Co. v. Puig</u>, 64 F. Supp. 2d 514 (D. Md. 1999) (citing, <u>inter alia</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

"Where . . . both parties have moved for summary judgment, it does not establish that there is no issue of fact and require that summary judgment be granted to one side or another." <u>World-Wide Rights Ltd. P'ship v. Combe, Inc.</u>, 955 F.2d 242, 244 (4th Cir. 1992) (citation and internal quotation marks omitted).   When both parties file motions for summary judgment, the court applies the same standards of review.   <u>Taft Broadcasting Co. v. United States</u>, 929 F.2d 240, 248 (6th Cir. 1991); <u>ITCO Corp. v. Michelin Tire Corp.</u>, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment--even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56

standard." <u>Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.</u>, 627

F. Supp. 170, 172 (D. Md. 1985) (quoting Wright, Miller & Kane,

<u>Federal Practice and Procedure: Civil 2d</u> § 2720).

## III. DISCUSSION

### A. Rehabilitation Act Claim

The Rehabilitation Act of 1973 prohibits discrimination

against a "qualified individual with a disability." 42 U.S.C. §

12112(a).[2] An "individual with a disability" is an individual

with a "physical or mental impairment that substantially limits

one or more of the major life activities of such individual." 29

C.F.R. § 1630.2(g)(1). "Walking" is specifically listed in the

implementing regulations as one of the "major life activities."

<u>Id.</u> § 1630.2(i). An individual is "substantially limited" in a

major life activity if he or she is "[s]ignificantly restricted

as to the condition, manner or duration under which an individual

can perform a particular major life activity as compared to the

condition, manner, or duration under which the average person in

the general population can perform that same major life

activity." <u>Id.</u> § 1630.2(j)(i).

An individual with a disability is a "qualified individual

with a disability" if that individual, "satisfies the requisite

skill, experience, education and other job-related requirements

---

[2] Section 12112 is part of the Americans With Disabilities
Act (ADA). The Rehabilitation Act parallels the ADA and claims
under the Rehabilitation Act are analyzed under the same
standards as ADA claims. 29 U.S.C. § 794; <u>Hooven-Lewis v.
Caldera</u>, 249 F.3d 259 (4th Cir. 2001).

of the employment position such individual holds or desires, and

[], with or without reasonable accommodation, can perform the

essential functions of such position." Id. § 1630.2(m).  Factors

to be considered in determining what functions are essential

include:

>    (i) The employer's judgment as to which
>    functions are essential;
>
>    (ii) Written job descriptions prepared before
>    advertising or interviewing applicants for
>    the job;
>
>    (iii) The amount of time spent on the job
>    performing the function;
>
>    (iv) The consequences of not requiring the
>    incumbent to perform the function;
>
>    (v) The terms of a collective bargaining
>    agreement;
>
>    (vi) The work experience of past incumbents
>    in the job; and/or
>
>    (vii) The current work experience of
>    incumbents in similar jobs.

Id. § 1630.2(n)(3).

The Rehabilitation Act not only prohibits discrimination

against qualified individuals with disabilities, but also imposes

an affirmative duty on the employing agency to provide

"reasonable accommodation" to conditions caused by the disability

"unless the agency can demonstrate that the accommodation would

impose an undue hardship on the operation of the program." Id. §

1613.704(a).  Reasonable accommodation is defined as

"[m]odifications or adjustments to the work environment, or to

the manner or circumstances under which the position held or

desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position" and can include "[j]ob restructuring, part-time or modified work schedules . . . and other similar accommodations for individuals with disabilities." Id. § 1630.2(o)(1)(ii) and (2)(ii).  "Undue hardship" is defined as "significant difficulty or expense" incurred by the agency with respect to the provision of an accommodation.  Id. § 1630.2(p)(1).  Furthermore, in determining appropriate reasonable accommodations, the regulations envision an "informal interactive process" involving the employer and the employee through which they can "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Id. § 1630.2(o)(3).

There is no dispute that Plaintiff is an individual with a disability.  Plaintiff submitted evidence that her medical condition seriously impairs her ability to walk.  She testified that she can walk no more than a block without suffering a temporary incapacitation fatigue.  Pl.'s Decl. ¶ 18.  She also submits a letter from her treating physician explaining those limitations.  Oct. 8, 1999, letter from Dr. Steve Strauss.  Based upon documentation provided by Plaintiff, including this letter, Defendant determined, in 1999, that Plaintiff was disabled and provided her a motorized scooter to move about the workplace. Defendant continued to provide that scooter until Plaintiff left the agency in 2003 and has offered no evidence in this action to

contradict Plaintiff's claim of disability.[3]

While not disputing that Plaintiff is disabled, Defendant argues that Plaintiff is not a "qualified" individual with a disability because her frequent absences render her unable to perform the "essential functions" of her position.  See Def.'s Mot. 15.  In support of this argument, Defendant represented in its motion that Plaintiff was absent from work 25% of the time in 2001, 50% in 2002, and 50% during the months she was employed in 2003.  There are several significant flaws in Defendant's argument.

First, Defendant miscalculates the percentage of time that Plaintiff was absent from work in 2002 and 2003.  Defendant now acknowledges that Plaintiff missed approximately 33% of work time in 2002, not 50%.  Def.'s Reply 4 n.1.  As to 2003, Plaintiff testifies that she recollects that she missed just 11 of the 35 weeks between January 1, 2003 and September 1, 2003, or less than 33% of work time.  See Pl.'s Supp. Decl. ¶¶ 1-4.  Although Defendant is critical of Plaintiff for not providing "proof or

---

[3] SSA states in its summary judgment motion that "[f]or the purposes of the SSA's Motion for Summary Judgment, the SSA concedes that Ms. Jacobson is an individual with a disability." Def.'s Mot. 13 n.9.  As Plaintiff aptly observes, however, the pleading that was Defendant's motion was also the opposition to Plaintiff's motion for partial summary judgment.  Because Plaintiff moved for judgment on the issue of her disability, Defendant had the burden of coming forward with evidence showing that there is a genuine dispute as to that issue.  See Fed. R. Civ. P. 56(e).  Since Defendant failed to come forward with any evidence challenging Plaintiff's disability status, that status is now established.

certainty" as to the weeks she worked, Def.'s Reply 4 n.1,
Defendant offers nothing to contradict Plaintiff's testimony.
Presumably, Defendant maintains attendance records of its
employees and could have produced evidence supporting its
figures.  Thus, at most, there is a dispute of fact as to days
missed by Plaintiff in 2003.

    Second, there is no evidence in the record that any of
Plaintiff's supervisors ever determined or in any way indicated,
until this litigation, that Plaintiff's absences prevented her
from being able to perform the essential functions of her job.
Defendant asserts that it is "immaterial that the SSA management
never found [Plaintiff] to not have satisfied SSA's attendance
requirements."  Def.'s Reply 3.  While not determinative,
management's silence certainly is material.  Evidence is material
if it "tends to influence the trier of fact because of its
logical connection with the issue."  Black's Law Dictionary 881
(5th ed. 1979).  The fact that Plaintiff's supervisors never
contemporaneously complained that Plaintiff's absences were
preventing her from performing her job undoubtedly undermines
Defendant's litigation position that they did.

     Defendant cites numerous cases where courts have held that
fewer absences than Plaintiff's prevented an employee from being
able to perform the essential functions of a particular job.
Different jobs, however, have different demands and while
regularity of attendance may be absolutely critical for some

10

positions, it might be less so for others.  Of significance in
most if not all of the cases cited by Defendant, unlike the case
at bar, the discharged employee's attendance was the subject of
discussion and discipline prior to the employee's termination.
<u>Tyndall v. National Educ. Centers, Inc. of California</u>, 31 F.3d
209, 212 (4th Cir. 1994) (discharged teacher's coworkers had
complained about plaintiff's absences, and supervisor had
expressed concern, prior to termination, that another absence
would further disrupt the operations of the school); <u>Brenneman
v. MedCentral Health System</u>, 366 F.3d 412, 416 (6th Cir. 2004)
(prior to termination, defendant had disciplined plaintiff
numerous times for his attendance problems); <u>Greer v. Emerson
Elec. Co.</u>, 185 F.3d 917, 919 (8th Cir. 1999) (plaintiff was
terminated for excessive absenteeism after receiving several
disciplinary actions under the employer's system of progressive
discipline).

Finally, Defendant's argument that Plaintiff "was not a
'qualified individual with a disability' because she could not
<u>come to work</u> on a regular basis," Def.'s Mot. 15 (emphasis
added), conflates the issue of whether Plaintiff is a qualified
individual with a disability with the issue of whether allowing
Plaintiff to work part-time <u>from home</u> is a reasonable
accommodation.[4]   A person can be qualified individual with a

---

[4] <u>See also</u> Def.'s Reply at 5 n.2 ("In July 2003, Ms.
Jacobson requested that she be permitted to work at home three
days a week and work [in the office] two days a week.  By her

disability if they are able to do their job <u>with reasonable accommodation</u>.  It is undisputed that Plaintiff would have been able to work a significantly greater percentage of time in 2003 had Defendant granted the accommodations she requested.  Whether those accommodations are reasonable is a separate question, which the Court must now address.

The reasonableness of a proposed accommodation is a question of fact which ordinarily should be decided by a jury.  <u>Pandazides v. Virginia Bd. of Educ.</u>, 13 F.3d 823, 833 (4th Cir. 1994).  Having reviewed the evidence submitted by the parties, the Court concludes that this is no exception.  A reasonable jury could find for either party.

As for Plaintiff's requested accommodations for the May 2003 post-hospitalization recovery period, it appears undisputed that, with VPN access, there would have been enough work for Plaintiff to do from home.  It also appears undisputed that Plaintiff requested VPN access in more than enough time for it to be approved when needed, but that approval was not forthcoming.[5] Why that access was not timely processed remains a mystery.  In

admission, Ms. Jacobson was not able <u>to come to work</u> more than two days a week, thereby rendering her not 'otherwise qualified' for her position.") (emphasis added).

[5] In his declaration, Davis criticizes Plaintiff for not making her request in advance and attempts to attribute the unavailability of access to Plaintiff's lack of diligence.  Davis Decl. 4.  Plaintiff submitted her request, however, on May 15, 2003, and did not need the access until several weeks after that date.  The record is clear that a request could easily be processed within that timeframe.  <u>See</u> Pl.'s Mot. 9-10 and exhibits referenced therein.

Plaintiff's words, the request got lost in "some bureaucratic Never-Never-Land."  Pl.'s Mot. 32.

Acknowledging that the "delay in the internal processing of the request cannot be explained," Defendant argues that Plaintiff must prove that the delay "was motivated by discriminatory intent" before she can establish a failure to accommodate claim. Def.'s Mot. 22.  A discriminatory animus requirement, however, is inconsistent with the purpose of the Rehabilitation Act.   As noted by the Supreme Court in <u>Alexander v. Choate</u>, 469 U.S. 287, 295 (1985), the Rehabilitation Act was motivated by Congress's determination that "[d]iscrimination against the handicapped . . . [is] most often the product, not of invidious animus, but rather of thoughtlessness and indifference-of benign neglect." The Court further noted that

> much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent.  For example, elimination of architectural barriers was one of the central aims of the Act, yet such barriers were clearly not erected with the aim or intent of excluding the handicapped.

<u>Id.</u> at 296-97.  Relying on this language from <u>Alexander</u>, most courts have held that "a plaintiff need not prove an impermissible intent under § 504 of the Rehabilitation Act . . . ."  <u>See</u> <u>Washington v. Indiana High School Athletic Ass'n, Inc.</u>, 181 F.3d 840 (7th Cir. 1999) (collecting cases).

Defendant also argues that a plaintiff cannot base an

accommodation claim on "an employer's delay in providing a
requested accommodation where the delay is due to internal
processing or to events outside the employer's control," relying
on <u>dicta</u> from an unreported decision from another circuit.
Def.'s Mot. 22 (citing <u>Gerton v. Verizon South, Inc.</u>, 145 Fed.
Appx. 159, 168 (6th Cir. 2005)).  There is, however, no hard-and-
fast rule excusing the failure to provide a reasonable
accommodation for a disability because of "internal processing
delays."  Instead, in assessing a claim based upon a delay, the
following factors must be considered: "the length of the delay,
the reason for the delay, whether the employer has offered any
alternative accommodations while evaluating a particular request,
and whether the employer has acted in good faith."  <u>Selenke v.
Medical Imaging of Colorado</u>, 248 F.3d 1249, 1263 (10th Cir.
2001).  Under these factors, a jury could decide this issue in
favor of Plaintiff or Defendant.[6]

Regardless of the delay in providing VPN access, Plaintiff
stated in her declaration that she could have been provided with
sufficient work to be done at home until she was able to return

---

[6] The gist of Defendant's argument on this issue appears to
be that, because Plaintiff's immediate supervisors approved her
VPN request in an expeditious manner, Defendant can escape
liability even though the request may have gotten lost in a
different SSA department.  It is the good faith and diligence of
the employer as a whole that is at issue, however, not the
diligence of particular supervisors.  <u>See</u> <u>Szedlock v. Tenant</u>, 139
F. Supp. 2d 725, 732 (E.D. Va. 2001) (in suit against the CIA for
failure to provide reasonable accommodation, noting "it is the
good faith of the CIA, not of [the plaintiff's supervisor], that
is relevant here").

to work even without that access.  Pl.'s Decl. ¶ 43.  Defendant
counters that statement with a declaration of Brigid Murphy that
there was not sufficient work to be done from home.  Murphy Decl.
2.  When questioned about that statement in her deposition,
however, Murphy could not provide any basis for her conclusion.
Murphy Dep. 88-89.  From Plaintiff's deposition testimony, it
appears the difficulty may have simply been that Plaintiff's
supervisors were busy with other matters and did not take the
time to identify tasks that Plaintiff could complete at home.
Pl.'s Dep. 109-115.  Whether Plaintiff's supervisors made a
reasonably diligent effort to identify available work is a
question best left to a jury.

    Similar questions arise with regard to Plaintiff's July 2003
request to work at home three days a week.  Defendant has offered
several justifications for denying that request.  Initially,
Davis simply stated that open-ended VPN access was against agency
policy.  July 16, 2003 email from Davis to Pl.  Defendant has not
produced any document memorializing that alleged policy and
Plaintiff has produced a collective bargaining agreement that
seems to allow precisely the accommodation requested, Pl.'s Ex.
10.  Defendant appears to have abandoned the "against official
policy" justification.

    Defendant now claims that the accommodation was impractical
because Plaintiff's position "is a 'hands on position' that
requires the employee to work face-to-face with internal and
external customers, perform research, attend meetings, and

15

brainstorm with coworkers in a group setting."  Def.'s Mot. 18.
In supporting this argument, Defendant submits the affidavit of
Ryland Davis.  Davis admits in his deposition, however, that he
has no idea how often these face-to-face encounters or team
meetings occur.  Davis Dep. 48-51.  The Court finds that it
simply cannot be determined from the current record if two days
in the office as proposed by Plaintiff would be sufficient to
fulfil those portions of Plaintiff's duties.

    As an additional reason for denying Plaintiff's July 2003
requests, Defendant now contends that Plaintiff failed to provide
adequate medical documentation in support of the request.  Like
the need for face-to-face contact and team meetings, this lack of
medical documentation was never mentioned as a reason when
Defendant denied Plaintiff's request.  This is particularly
problematic in that, had Plaintiff been told this reason for the
denial, she could have remedied the deficiency.  As other courts
have noted, "an employee's request for reasonable accommodation
requires a great deal of communication between the employee and
employer[;] . . . both parties bear responsibility for
determining what accommodation is necessary."  Bultemeyer v. Fort
Wayne Comm. Schools, 100 F.3d 1281, 1285 (7th Cir. 1996).  If
Defendant had concerns regarding the scope of medically necessary
accommodations, it had the obligation to raise those concerns in
a timely manner so that Plaintiff could address them.

    Finally, Defendant asserts that it could not grant
Plaintiff's other July 2003 request - that she be permitted to

make up the time at the end of her shift on days she was unable
to arrive to work by 9:30 - because to do so would require
Defendant to pay a night differential stipend.  First, it is not
clear that as a flextime employee, Plaintiff would have been
entitled to the differential.  See 5 U.S.C. § 6123(c)(1).
Second, it would be a fact question for the jury as to whether
the payment of this slight differential for the few hours that it
might be in force would amount to an undue burden on the agency.

        B. Constructive Discharge

        In her third count, Plaintiff contends that the reduction in
hours caused by Defendant's denial of her requested
accommodations in July 2003 and the prospect of similar
reductions in the future constituted a "constructive discharge."
Comp. ¶ 47.  She explains further in her supplemental declaration
that she was allowed under a limited special program, to take an
early retirement if she did so before September 2003.  Otherwise,
she would need to wait until September 2005 to be able to retire
with any benefits.  With all indications pointing to the
conclusion that Defendant would not provide the accommodations
necessary to allow her to work enough hours to meet her financial
obligations, Plaintiff determined that she had no choice but to
retire and obtain at least some retirement benefits.

        Citing cases decided under Title VII, Defendant argues that
Plaintiff cannot establish a cause of action for constructive
discharge unless she can prove "that the SSA deliberately made
her working conditions 'intolerable' in an effort to induce her

17

to quit." Def.'s Mot. 32.  As discussed above, however, to

establish a claim under the Rehabilitation Act does not require

proof of discriminatory intent.  Plaintiff draws an apt

comparison:

> if an employee is in a wheelchair, and the
> wheelchair ramp into the workplace suddenly
> disappears, the employee is out of work even
> though the employer has not formally
> discharged him or her.  It is difficult to
> describe this situation as other than a
> constructive discharge, even if the removal
> of the wheelchair ramp was not done for the
> purpose of getting rid of that particular
> employee.

Pl.'s Opp. 43.  While Plaintiff may or may not be able to

convince a jury that the accommodations she requested were

reasonable, if she can do so, and if she can also convince the

jury that without the benefit of those accommodations, economic

considerations forced her to take early retirement, she would be

entitled to damages incurred because of that forced early

retirement.

## IV. CONCLUSION

For these reasons, the Court concludes that, while the issue

of Plaintiff's disability has been established as a matter of law

in Plaintiff's favor, the remaining issues are best left for

resolution by a jury.[7]  A separate order consistent with this

memorandum will issue.

---

[7] Plaintiff's age discrimination claim (Count II) will be
dismissed, with prejudice, based upon Plaintiff's representation
that she is abandoning that claim.

/s/
_____
William M. Nickerson
Senior United States District Judge


Dated: December 14, 2006